UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOSEPH F. TOLARO,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | CASE NO. 1:22-CV-01843-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION AND ORDER** |

INTRODUCTION

Plaintiff Joseph F. Tolaro filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On October 13, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a report and recommendation (non-document entry dated Oct. 13, 2022), and the parties subsequently consented to my jurisdiction pursuant to 28 U.S.C. § 636 (ECF #6). Following review, and for the reasons stated below, I **REVERSE** the Commissioner's decision.

PROCEDURAL BACKGROUND

Mr. Tolaro filed for DIB on August 15, 2018, alleging a disability onset date of September 1, 2013. (Tr. 267). His claims were denied initially and on reconsideration. (Tr. 81, 93). He then

1

requested a hearing before an Administrative Law Judge. (Tr. 153-54). Mr. Tolaro (represented by counsel) and a vocational expert (VE) testified before the ALJ on December 3, 2019. (Tr. 56-80).

On January 9, 2020, the ALJ issued a written decision finding Mr. Tolaro not disabled. (Tr. 109-27). The Appeals Council granted Mr. Tolaro's request for review, and on February 10, 2021, remanded the case to the ALJ to (i) provide sufficient explanation for rejecting the opinion of Brian Bennett, M.D., (ii) clarify Mr. Tolaro's mental residual functional capacity, and (iii) fully evaluate Mr. Tolaro's subjective complaints under SSR 16-3p. (Tr. 128-33).

On remand, Mr. Tolaro (represented by counsel) and a VE testified at another hearing before the same ALJ on June 7, 2021. (Tr. 36-55). On June 30, 2021, the ALJ issued a second written decision finding Mr. Tolaro not disabled. (Tr. 16-35). The Appeals Council denied Mr. Tolaro's request for review, making the second hearing decision the final decision of the Commissioner. (Tr. 1-7; *see* 20 C.F.R. §§ 404.955, 404.981). Mr. Tolaro timely filed this action on October 13, 2022. (ECF #1).

## FACTUAL BACKGROUND

I. ADMINISTRATIVE HEARING

At the first hearing on December 3, 2019, Mr. Tolaro and VE Mark Anderson testified. (Tr. 58).

Mr. Tolaro last worked as a patrol officer for the City of Westlake, completing investigations, traffic stops, and alarm calls. (Tr. 62). He spent 30% of the day standing or walking. (*Id.*). Mr. Tolaro was injured during a traffic stop when a suspect's car began rolling down the street and Mr. Tolaro jumped behind it and held it there while someone put it in park. (*Id.*). He had his first surgery less than a month after this accident. (*Id.*). He then returned to light duty,

2

working in the evidence room for about a year but stopping in August of 2013 at his doctor's recommendation. (Tr. 63). Mr. Tolaro did not work after that. (*Id.*).

Mr. Tolaro underwent five surgeries on his low back, the most difficult being the second in January of 2014. (Tr. 63-64). Prior to that surgery, he could not stand up straight, suffered from drop foot, and used a brace. (Tr. 64). At the time of the first hearing, he felt worse than he did after his second surgery. (*Id.*). He had been in his current state of pain for five years. (*Id.*).

Mr. Tolaro has received injections without relief and completed physical therapy for six or seven years, working on range of motion and strength. (Tr. 65). Although he no longer takes medication, he used to take Percocet, Vicodin, and morphine. (Tr. 66). He has aggravated his back injury by loading the dishwasher and doing laundry. (Tr. 67). Mr. Tolaro has used a cane since 2011. (*Id.*). During the relevant time period in 2013, he was able to stand for an hour or two and walk 300 feet without having to sit or take a break. (*Id.*). He could sit for 45 minutes to an hour without needing to stand. (*Id.*). He has not been "allowed" to lift more than eight pounds nor reach overhead. (Tr. 67-68). Mr. Tolaro also developed foot and leg problems a week after the accident, causing him to fall on the stairs and outside while walking. (Tr. 68).

On a typical day during the relevant period, Mr. Tolaro would awaken, bring his daughter to school or the bus stop, and return home to sleep. (Tr. 69). He was often tired because the pain made it difficult to sleep. (*Id.*). He very rarely left the home for reasons other than medical appointments or going to the gas station or store if his wife was unable to complete shopping. (Tr. 69-70). He was limited to driving 30 minutes. (Tr. 70).

During that time, Mr. Tolaro struggled to put on socks and could not tie his shoes. (*Id.*). He required a shower chair and grab bars for his toilet so he could stand. (*Id.*). He could not

3

complete household chores or cook other than an easy meal, like macaroni and cheese. (*Id.*). His previous hobbies included woodworking and working on cars, which he was unable to continue after the accident. (*Id.*).

Mr. Tolaro also suffers from panic attacks every time he leaves his house and has taken Xanax and Cymbalta. (Tr. 71). When he has a panic attack, his heart races and he cannot catch his breath, causing him to feel nauseous and sweaty. (Tr. 71-72). The panic attacks are triggered by new buildings, too many people, and elevators. (Tr. 72). Mr. Tolaro believes his body cannot physically handle working because he stays awake for three days at a time and randomly falls asleep. (*Id.*).

Mr. Tolaro's testimony regarding his symptoms was largely identical at the second hearing on June 7, 2021. (Tr. 36-55). At both hearings, VEs Anderson and Salkin categorized Mr. Tolaro's past work as police officer, DOT 375.263-014, medium level exertion, skilled, SVP 6. (Tr. 49, 75). At the second hearing, VE Salkin testified to various hypotheticals relevant to the ALJ's analysis on remand.

**Hypothetical One.** VE Salkin first assumed an individual of the same age, education, and work history as Mr. Tolaro who can lift twenty pounds occasionally and ten pounds frequently; stand and walk four out of eight hours; sit six out of eight hours; push, pull, and foot pedal constantly bilaterally; occasionally use a ramp or stairs but never use a ladder, rope or scaffold; occasionally stoop, frequently kneel, frequently crouch, and occasionally crawl; has no manipulative limitations, visual limitations, or communication deficits; complete no complex tasks but can complete simple and routine tasks; respond appropriately to supervisors, coworkers, and usual work situations; deal with changes in routine work setting; focus attention on simple or

4

routine activities for at least two hours at a time; stay on task in a sustained rate such as initiating and performing a task that they understand how to do; work at an appropriate and consistent pace and complete tasks in a timely manner; ignore or avoid distractions while working; change activities or work settings without being disrupted; only do low stress work with no hard production quotas or piece rate work; and have only occasional and superficial interactions with the public and coworkers. (Tr. 50-51). VE Salkin testified the individual could not perform past relevant work but could work as a price marker (DOT 209.587-034), office helper (DOT 239.567-010), or mail clerk (DOT 209.687-026). (Tr. 51). All three positions are SVP 2, unskilled, light exertion. (*Id.*).

**Hypothetical Two.** VE Salkin next assumed the same individual from Hypothetical One, but limited the hours the person could stand to two out of eight. (Tr. 52). That person would be limited to sedentary work, including document preparer (DOT 249.587-018), table worker (DOT 739.687-182), or film touch up inspector (DOT 726.684-050). (*Id.*). All three positions are SVP 2, unskilled, and sedentary. (*Id.*)

**Hypothetical Three.** VE Salkin next assumed the same individual from Hypothetical One, but assumed the individual can sit for four of eight hours, requires an option to sit or stand every 30 minutes for 5 minutes at a time, always requires the use of a cane while walking, and can have no interaction with the public. (Tr. 53). VE Salkin testified this individual would not be capable of performing jobs at any exertion level. (*Id.*).

VE Salkin also testified the customary tolerance for absenteeism is one absence per month and for off task behavior is ten percent of the time. (Tr. 53-54).

5

II.     PERSONAL AND VOCATIONAL EVIDENCE

Mr. Tolaro was 31 years old on his alleged onset date, and 37 years old at the administrative hearing. (Tr. 59-60). He completed high school and police academy before working as a police officer. (Tr. 59).

III.     RELEVANT MEDICAL EVIDENCE

Mr. Tolaro was injured at work as a police officer on May 13, 2011, after jumping in front of a car that started rolling back toward his police cruiser, causing back pain radiating down his leg. (Tr. 380, 1049). A June 3, 2011 MRI of his lumbar spine revealed central protrusion of the L3-L4 disc without central canal or neural foraminal narrowing, extrusion and sequestration of the L4-L5 disc migrating inferiorly behind the superior L5 vertebral body in the left lateral recess severely compressing the left traversing nerve root, mild left neural foraminal narrowing, and slight central protrusion of the L5-S1 disc without central or neural foraminal narrowing. (Tr. 1257).

On June 14, 2011, orthopedic surgeon D. Philip Stickney, M.D., performed a left hemilaminotomy with partial medial facetectomy and discectomy and microdissection and discectomy with microscope. (Tr. 1189). Mr. Tolaro was prescribed a left foot/ankle custom orthotic. (Tr. 1195).

On April 12, 2013, Dr. Stickney reported Mr. Tolaro had developed facet arthrosis at the site of his prior surgery. (Tr. 1039). An August 1, 2013 MRI of the lumbar spine revealed a left paracentral/lateral disc extrusion extending into the caudal canal; secondary left L5 subarticular recess stenosis with posterior displacement/compression of the left L5 nerve root; moderate left L4-L5 neural foraminal narrowing; loss in height of the L5-S1 intervertebral disc with a mild annular disc bulge and a small central disc herniation with annular fissuring extending slightly

6

caudal to the intervertebral disc space level partially effacing the facet anterior to the thecal sac; small central protrusion of the L3-L4 intervertebral disc with annular fissuring mildly flattening the anterior aspect of the thecal sac; and mild L3-L4 central canal stenosis. (Tr. 1017-18). Dr. Stickney referred Mr. Tolaro to an orthopedic surgeon, Louis Keppler, M.D. (Tr. 996). On July 26, 2013, Mr. Tolaro returned to Dr. Stickney reporting worsening back pain. (Tr. 1023). He was struggling just to get out of bed in the morning and bought a new mattress that did not help. (*Id.*).

On October 3, 2013, Mr. Tolaro attended a psychiatric evaluation with Abdon Villalba, M.D., to determine whether his alleged panic disorder should be an allowed condition added to his workers' compensation claim. (Tr. 999). Dr. Villalba determined that Mr. Tolaro suffered from panic disorder directly caused by his on-the-job injury and opined it should be an allowed condition for which he receives covered treatment. (Tr. 1002-03). Dr. Villalba's interview notes reflected Mr. Tolaro still took Percocet, Neurontin, and Advil for pain. (Tr. 1001). He conveyed "95% of his problem is due to his back pain," but he nevertheless walks, helps the family, and plays with his 5-year-old daughter. (*Id.*).

Mr. Tolaro presented to Dr. Keppler on November 21, 2013. (Tr. 992). Dr. Keppler believed Mr. Tolaro would require a lumbar fusion and informed Mr. Tolaro he would not entertain dealing with his issues at L3 at this time; Dr. Keppler emphasized L3 may undergo further degeneration and may require subsequent surgical treatment. (Tr. 992). On January 22, 2014, Dr. Keppler performed Mr. Tolaro's second back surgery, a posterior lumbar interbody fusion at L4-L5 with segmental spinal instrumentation; bilateral lateral fusion at L4-L5; laminectomy at L4 and L5 with a medial facetectomy and bilateral foraminotomy; and discectomy with interbody fusion, bilateral lateral fusion, and iliac crest bone marrow aspirate. (Tr. 2497). On

7

April 28, 2015, Dr. Keppler wrote a letter detailing Mr. Tolaro's medical status to assist with his workers' compensation claim opining that had it not been for his original injury, none of his medical problems would have arisen. (Tr. 689-92).

A July 30, 2015 MRI of Mr. Tolaro's lumbar spine revealed a disc bulge at L3-L4 with central disc extrusion and annular fissuring that mildly flattened the anterior aspect of the thecal sac and mild central canal stenosis with severe attenuation of the thecal sac. (Tr. 2784). On June 8, 2016, Dr. Keppler performed Mr. Tolaro's third back surgery, a L3 anterior fusion through a trans-psoas retroperitoneal approach. (Tr. 2775-76). On January 9, 2017, Dr. Keppler noted Mr. Tolaro experienced a non-union at L3. (Tr. 2940). Dr. Keppler recommended further surgery and noted that the surgery may or may not require a complete revision of his entire lumbar instrumentation. (*Id.*).

On March 1, 2017, Dr. Keppler performed Mr. Tolaro's fourth back surgery, a revision posterior lumbar instrumentation with extension of instrumentation L3 to sacrum, iliac crest bone marrow aspirate, and bilateral lateral fusion L3 to sacrum. (Tr. 2944).

On July 15, 2019, James Anderson, M.D. performed Mr. Tolaro's fifth back surgery, a decompressive left-side laminectomy at L2-L3 down to L3-L4; microdisc excision to remove disc fragments at L3-L4; and full hemilaminectomy at L2-L3. (Tr. 2873). Dr. Anderson noted the presence of "quite a bit of scar tissue so there was a lot of lysis of adhesions as well as the decompression and the micro disk excision." (*Id.*).

IV.     MEDICAL OPINIONS

Stephen Sutherland, M.D., reviewed Mr. Tolaro's records at the initial level. (Tr. 91). Dr. Sutherland found Mr. Tolaro was capable of occasionally lifting twenty pounds; frequently lifting

8

ten pounds; standing, sitting, or walking six hours out of eight; limited lifting in left lower extremities; and occasional climbing of ramps and stairs, unlimited balancing, occasional stooping and crawling, and frequent kneeling and crouching. (Tr. 89-90). Dr. Sutherland also limited Mr. Tolaro to avoid all exposure to hazards such as machinery and unprotected heights. (Tr. 90). On reconsideration, Indira Jasti, M.D., reviewed Mr. Tolaro's records and adopted Dr. Sutherland's opinion in full. (Tr. 104).

Cynthia Waggoner, Psy.D., reviewed Mr. Tolaro's records at the initial level and determined Mr. Tolaro had no medically determinable mental impairments. (Tr. 87). On reconsideration, Bonnie Katz, Ph.D., determined that there was insufficient evidence at the initial level and, upon considering additional psychological evaluations, found moderate limitations in the following abilities: maintaining attention and concentration for extended periods; completing a normal workday without interruptions from psychologically based symptoms; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. (Tr. 104-105).

## THE ALJ'S DECISION

The ALJ's decision, dated July 6, 2021, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of September 1, 2013 through his date last insured of December 31, 2013 (20 CFR 404.1571 et seq.).

9

3. Through the date last insured, the claimant had the following severe impairments: osteoarthritis, degenerative disc disease, and anxiety (20 CFR 404.1520).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except stand/walk two hours per workday; sit six hours per workday; foot pedal occasionally with both lower extremities; occasionally climb ramps/stairs, stop, and crawl; never climb ladders/ropes/scaffolds; frequently kneel and crouch; he can never be exposed to hazards such as unprotected heights; can do no complex tasks; simple (routine) tasks which I define to mean this person has the basic mental aptitude to meet the demands of competitive, remunerative, unskilled work including the abilities to, on a sustained basis, understand, carry out, and remember simple instructions; can respond appropriately to supervision, coworkers, and usual work situations; and can deal with changes in routine work settings; can focus attention on simple or routine work activities for at least 2 hours at a time and can stay on task at a sustained rate such as initiating and perform a task that they understand and know how to do; can work at an appropriate and consistent pace and can complete tasks in a timely manner; can ignore or avoid distractions while working; can change activities or work settings without being disruptive; can do only low stress work meaning no high production quotas or piece rate work; can have occasional and superficial interactions with public and co-workers meaning limited to speaking, signaling, taking instructions, asking questions and similar contact with no arbitration, negotiation, confrontation, supervision of others, or commercial driving.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on June 11, 1982 and was 31 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

(Tr. 21-30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a

"zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### Discussion

Mr. Tolaro's sole argument on appeal is that the ALJ's assessment of Mr. Tolaro's symptoms did not comply with the requirements of SSR 16-3p. (Pl.'s Br., ECF #8, PageID 3374). ALJs are to "consider all of the evidence in an individual's record" and determine whether the individual is disabled by examining "all of the individual's symptoms, including pain, and the

extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the individual's record." SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). ALJs also evaluate what the agency formerly termed the "credibility" of a plaintiff's statements about his or her symptoms. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 246-49 (6th Cir. 2007). In March 2016, the agency eliminated its use of the term "credibility" and clarified "that subjective symptom evaluation is not an examination of an individual's character. . . ." SSR 16-3p, 2016 WL 1119029, at *1 (rescinding and superseding SSR 96-7p). To avoid such mistaken emphasis, this analysis is now characterized as the "consistency" of a claimant's subjective description of symptoms with the record. *See Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 n.3 (6th Cir. 2020) (citing *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)).

Symptom evaluation is a two-step inquiry. First, the ALJ determines if the record contains objective medical evidence of an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms. SSR 16-3p, 2016 WL 1119029, at *3; *see also* 20 C.F.R. § 404.1529(a); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). Second, the ALJ considers the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities. *See* 20 C.F.R. §§ 404.1529(a), (c); SSR16-3p, 2016 WL 1119029, at *4. In making this determination, the ALJ considers the following:

- the claimant's daily activities;
- the location, duration, frequency, and intensity of the claimant's pain or other symptoms;
- precipitating and aggravating factors;
- the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate their pain or other symptoms;

14

- treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
- any measures used to relieve pain or other symptoms; and
- other factors concerning functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). An ALJ may not consider only objective medical evidence in determining disability unless this evidence alone supports a finding of disability. SSR 16-3p, 2016 WL 1119029, at *5. The regulations at 20 C.F.R. § 404.1529 outline an ALJ's analysis with respect to objective medical evidence as follows:

> *Consideration of objective medical evidence.* Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. **However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.**

20 C.F.R. § 404.1529(c)(2) (emphasis added).

It is not enough for an ALJ "simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *9; *see also id.* at *7 (noting that the ALJ "will discuss the factors pertinent to the evidence of record").

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and

15

deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from them. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Mr. Tolaro argues the ALJ's rejection of his symptoms did not include citations to the record. (Pl.'s Br., ECF #8, PageID 3376). The Commissioner responds that the ALJ provided specific citations when discussing the same findings earlier in his decision. (Comm'r's Br., ECF #9, PageID 3387). As the Commissioner argues, it is well established that the ALJ is not required to cite specific records at every instance because the decision is meant to be read as a whole. "The Court rejects [the claimant]'s argument that remand is nonetheless required because the ALJ did not specifically cite any particular treatment notes . . . It is well-established that courts may review an ALJ decision as a whole in determining whether it is supported by substantial evidence." *Adams v. Kijakazi*, No. 1:21CV2199, 2023 WL 2347368, at *14 (N.D. Ohio Mar. 3, 2023). As such, I find this is insufficient to support a decision reversing the Commissioner's determination.

Mr. Tolaro next argues the ALJ misstated the record in finding that Mr. Tolaro had no documented need for an assistive device, noting he was prescribed a left foot orthotic and used a cane. (Pl.'s Br., ECF #8, PageID 3376). Mr. Tolaro points out ALJ included the required use of a cane in the original RFC but failed to include the requirement in the RFC on remand "likely because the second vocational expert testified that a cane would be work-preclusive." (Pl.'s Br.,

ECF #8, PageID 3376 n.5). Notably, in the original determination, the ALJ never states Mr. Tolaro *requires* a cane, but rather that he *uses* one. (*See* Tr. 119 ("Claimant also testified he needed a cane during the relevant period."); Tr. 116 (noting that Mr. Tolaro "uses a cane when standing or ambulating")). The ALJ's subsequent determination is therefore more specific, stating: "as noted, during the time at issue, there was no need for a cane." (Tr. 28). This determination is reasonably supported by the fact Mr. Toledo was never prescribed a cane.

The ALJ did state Mr. Tolaro was prescribed a left foot orthotic. (Tr. 24, 25). The Commissioner argues the ALJ's reference to an assistive device "clearly meant handheld assistive device, given that the ALJ highlighted that [Mr. Tolaro] did not need a cane, and in light of the rule for handheld assistive devices set forth in SSR 96-9p." (Comm'r's Br., ECF #9, PageID 3388). The rules states:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). I agree with the Commissioner that the ALJ likely referred to a handheld assistive device when explaining Mr. Tolaro did not require one: "there was evidence from Dr. Stickney that the foot drop had resolved, and he did not require an assistive device, such as a cane." (Tr. 28). It is also unclear from the record how long and under what conditions or circumstances Mr. Tolaro was to use the orthotic. Therefore, even if the orthotic is an assistive device for purposes of SSR 96-6p, its prescription was not sufficiently

17

specific to warrant its inclusion in the RFC under SSR 96-6p, and its exclusion is therefore appropriate. Thus, Mr. Tolaro's second argument does not support reversing the Commissioner's decision.

Finally, Mr. Tolaro argues his ability to drive, walk, help his family, and play with his young daughter is not an adequate rationale to discount his statements regarding the severity and persistence of his own symptoms. (Pl.'s Br., ECF #8, PageID 3376-77). The ALJ determined:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because during the time at issue, he had normal sensations, normal reflexes, there was evidence from Dr. Stickney that the foot drop had resolved, and he did not require as assistive device, such as a cane. As late as October 2013, he was able to drive, to walk, to help his family, and to play with his young daughter . . .
>
> I have reduced the claimant to the sedentary level of exertion due to his pain and the history of the left foot drop. I have carried forward the postural limitations and the limitations on his lower extremities. I have expanded the mental health limitations in line with the directives of the Appeals Council. As noted, during the time at issue, there was no need for a cane. His sensations and reflexes were normal. He was able to walk, drive, play with his daughter, and help with his family. Again, his own physician, Dr. Stickney, reported that the left foot drop had resolved during the time at issue.

(Tr. 28).

Mr. Tolaro argues the ALJ's "too brief analysis contained several factual errors." (Pl.'s Br., ECF #8, PageID 3374). For example, "the ALJ said that [Mr. Tolaro] had normal sensations during the relevant time period. This was incorrect." (*Id.* at PageID 3376). True, on November 21, 2013, Dr. Keppler stated Mr. Tolaro had "weakness of his left foot dorsiflexors on examination today." (Tr. 992). The ALJ fails to resolve the discord between Mr. Tolaro's alleged "normal sensations" and the instance where his sensation and flexion was clearly not normal.

More importantly, however, the ALJ again failed to articulate adequate rationale under 20 C.F.R. § 404.1529(c)(3) for rejecting the intensity and duration of Mr. Tolaro's self-reported symptoms as directly instructed by the Appeals Council. The Appeals Council found the following error with the ALJ's original determination:

> The decision does not fully evaluate the claimant's subjective complaints, nor their impact on the residual functional capacity, as required by 20 CFR 404.1529 and Social Security Ruling 16-3p. The Administrative Law Judge concluded the claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and the other evidence in the record (Decision, page 6). However, the decision does not contain adequate rationale in support of this conclusion as it does not weigh relevant factors such as the claimant's prior work record, daily activities, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; other measures used to relieve symptoms; and other factors related to the claimant's functional limitations and restrictions. The decision must contain specific reasons for the symptom allegation finding, supported by the evidence of record, and must be sufficiently specific to make clear the weight given the individual's statements and the reasons for that weight. Further, an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

(Tr. 130).

In reading the opinion as a whole, the ALJ again failed to weigh relevant factors as instructed by the Appeals Council, including the claimant's prior work record, the duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; other measures used to relieve symptoms; and other factors related to the claimant's functional limitations and restrictions. (Tr. 130). Although the ALJ addressed Mr. Tolaro's activities of daily living (ADL), the failure to address any other relevant factor means I am unable to assess whether substantial evidence supports the ALJ's rejection of Mr. Tolaro's symptoms.

The decision must contain specific reasons for rejecting Mr. Tolaro's account of his own symptoms, supported by the evidence of record, and must be sufficiently specific to make clear the weight given his statements and the reasons for that weight. (*Id.*). The only accurate rationale the ALJ cites in support of rejecting Mr. Tolaro's symptoms is his ADLs, which, especially in light of the Appeals Council's explicit instructions to provide a more sufficient rationale for rejecting Mr. Tolaro's account of his symptoms, cannot, on its own, carry the opinion under SSR 16-3p.

## Conclusion

Following review of the arguments presented, the record, and the applicable law, I find that substantial evidence does not support the Commissioner's decision denying disability insurance benefits. I therefore **REVERSE** the Commissioner's decision and remand for further proceedings consistent with this Order.

Dated: August 30, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE